**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAVID W. COVELL and MARGARET** | : | |
| **COVELL, plenary guardians of the** | : | |
| **person of DAVID F. COVELL,** | : | |
| **Plaintiffs,** | : | **CIVIL ACTION** |
| | : | **NO. 09-2470** |
| **v.** | : | |
| | : | |
| **BELL SPORTS, INC., and** | : | |
| **PERFORMANCE, INC., et al.,** | : | |
| **Defendants.** | : | |
| | : | |

# ORDER

On July 23, 2010, a jury returned a verdict for Defendants in this products liability dispute. Plaintiffs now move for a new trial under Federal Rule of Civil Procedure 59(a). *(Doc. No. 162.)* For the reasons that follow, I will **DENY** Plaintiffs' Motion.

## I. BACKGROUND

This products action stems from a January 2, 2007 accident in which David F. Covell, Jr. was struck by an automobile driven by Michael Kenig as Kenig was entering the parking lot of a school owned and operated by the Archdiocese of Philadelphia. On April 14, 2009, David W. Covell, Sr. and Margaret Covell, as Covell Jr.'s plenary guardians, filed a Complaint in Philadelphia Common Pleas Court against Defendants Bell Sports, Inc., Easton-Bell Sports, Inc., and Performance, Inc., alleging that the Giro Monza helmet worn by their son during the 2007 accident was defectively designed and had inadequate warnings. *(Doc. No. 1, Ex. B.)* Plaintiffs had previously settled a separately filed negligence action against Kenig and the Archdiocese. *See* Doc. No. 50.

On June 1, 2009, Defendants removed to this Court.  *(Doc. No. 1.)*  One week later,

Defendants filed a Third-Party Complaint against the Archdiocese and Kenig, seeking

indemnification and contribution.  *(Doc. No. 3.)*

During trial -- which began on July 16, 2010 and ended on July 23, 2010 -- Defendants

voluntarily dismissed all third-party claims against the Archdiocese and Mr. Kenig.  *Trial Tr. vol.*

*2 (full), 7:19-9:13, July 19, 2010; Trial Tr. vol. 5 (full), 3:4-4:4, July 22, 2010.*  After the close of

Plaintiffs' case, I granted Defendant Easton Bell Sports' unopposed Motion for a Directed

Verdict.  *Trial Tr. vol. 4 (full), 5:10-18, July 21, 2010.*  On July 23, 2010, the jury returned a

verdict in favor of Defendants Bell Sports and Performance.  *(Doc. Nos. 156, 159.)*

On August 4, 2010, Plaintiffs filed the instant Motion for a New Trial.  *(Doc. No. 162.)*

On August 16, 2010, Defendants filed a Response in Opposition.  *(Doc. No. 164.)*  On August

20, 2010, Plaintiffs filed a Reply, and on September 1, 2010, Defendants filed a Sur-Reply.

*(Doc. Nos. 165, 172.)*

## II.   LEGAL STANDARDS

A court may grant a motion for a new trial "for any reason for which a new trial has

heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59.  The decision "is

within the sound discretion of the trial judge."  Mulholland v. Hoffer, 2007 U.S. Dist. LEXIS

31952, at *5 (E.D. Pa. May 1, 2007).  When a party moves for a new trial on the basis of trial

error, the court "must first determine whether an error was made in the course of the trial, and

then must determine whether that error was so prejudicial that refusal to grant a new trial would

be 'inconsistent with substantial justice.'"  State Farm Mut. Auto. Ins. Co. v. Lincow, 2010 U.S.

Dist. LEXIS 54513, at *14-15 (E.D. Pa. June 2, 2010) (citation omitted); see also Rapine v.

Harrah's Atl. City, 2006 U.S. Dist. LEXIS 11543, at *3 (E.D. Pa. March 21, 2006) ("A court has

the clear authority to order a new trial where, *inter alia*, . . . a prejudicial error of law was

made."). If an error does "not affect any parties' substantial rights," it is not prejudicial and thus

will not justify a new trial. Fed. R. Civ. P. 61; see also Abrams v. Lightolier, Inc., 50 F.3d 1204,

1213 (3d Cir. 1995) (harmless error "cannot be grounds for reversal or a new trial"); Lincow,

2010 U.S. Dist. LEXIS 54513, at *39-40 ("Trial errors are considered harmless when it is highly

probable that the error did not affect the outcome of the case.") (citations and quotation marks

omitted).

## III.    DISCUSSION

Plaintiffs argue that I committed "clear and prejudicial error[s] of law" by: (1) prohibiting

Plaintiffs from showing a video to the jury during their cross-examination of defense expert Dr.

Thomas Gennarelli; (2) applying the Restatement (Third) of Torts to Plaintiffs' claims; and (3)

admitting industry standards. *(Doc. No. 162.)* Because these arguments are meritless, I will deny

Plaintiffs' Motion.

### A.    Exclusion of Video

During trial, Defendants presented the testimony of Dr. Thomas Gennarelli, an expert in

the fields of "neurological surgery [and] brain surgery." *7/21/10 Tr. (full) at 170:9-10.* Dr.

Gennarelli is currently Professor of Neurosurgery at the Medical College of Wisconsin in

Milwaukee. He has practiced neurosurgery since 1976 and is the author of "more than 400

scientific publications in medical, neurosurgical and engineering journals in the fields of head

injury causation and treatment, biomechanics of brain injury, automotive (crash) medicine and

crash-injury relationships." *Doc. No. 118, Ex. K, Gennarelli Report at 1.* Dr. Gennarelli

testified, *inter alia*, that the "diffuse axonal injury" suffered by Mr. Covell during his 2007 accident likely resulted from the rotational acceleration of his head rather than from direct impact with Mr. Kenig's windshield.  *7/21/10 Tr. (full) at 200:5-206:14.*

In questioning Dr. Gennarelli about his qualifications, Plaintiffs asked him about head injury experiments conducted under his supervision on baboons at the University of Pennsylvania in the early 1980s.  Insofar as Plaintiffs' questions related to whether the diffuse axonal injury suffered by the baboons was caused by rotational or linear acceleration, Dr. Gennarelli answered the questions without objection.  *Id. at 180:3-181:8.*  It soon became apparent, however, that Plaintiffs sought only to embarrass the witness and inflame the jury by questioning him repeatedly about whether some of the experimenters had abused the baboons.  *See id. at 181:22-23 ("[I]n those experiments, was the monkey hit in the head with a hammer?").*  Plaintiffs then asked "to show the witness a video of his experiment."  *Id. at 183:2-3.*  Plaintiffs never even attempted to establish the authenticity of the video.  I sustained Defendants' objection, advising Plaintiffs that the video was irrelevant to Dr. Gennarelli's qualifications.  *Id. at 182:23-183:5.*

After Dr. Gennarelli completed his direct testimony, Plaintiffs sought again to introduce the video and question him yet again about whether, after rotating the baboons' helmeted heads, the experimenters "hit the helmet with the animal's head in it . . . in order to get the helmet off."  *Id. at 225:15-17.*  Plaintiffs' counsel stated "I'd be willing to forgo the video to simply bring out the fact that this occurred."  *Id. at 225:22-24.*  I noted that Plaintiffs had already made this fact known to the jury -- having mentioned it repeatedly before Defendants raised any objection.  *Id. at 226:2-8.*  After watching the subject video at Plaintiffs' request, I prohibited Plaintiffs from showing the video to the jury, noting that it did not "have anything to do with this case," and, in

4

the alternative, that its prejudicial effect outweighed its probative value.  *Id. at 210:24-211:6, 226:15-19.*

Even though they had stated that they were willing to "forgo" showing the video to the jury, Plaintiffs now argue that my exclusion of the video was "a substantial error of law" because Plaintiffs "were denied a chance to attempt to disqualify or call into question the basis for Dr. Gennarelli's opinions in this case."  *(Doc. No. 162, Mem. at 9.)*  I believe Plaintiffs have waived their objection to my exclusion of the video.  See Waldorf v. Shuta, 142 F.3d 601, 629 (3d Cir. 1998) ("[I]t is clear that a party who fails to object to errors at trial waives the right to complain about them following trial.").  In any event, the objection is meritless.

The subject video -- which was made in 1984 and depicts experimenters placing anesthetized baboons in vices and smashing their heads with hammers -- had no relevance to the question of what caused Mr. Covell's injuries.  Dr. Gennarelli did not refer to the experiments in his testimony.  Rather, he referred exclusively to Mr. Covell's medical records and his examination of Mr. Covell.  Although Dr. Gennarelli cited one article in his expert report that discussed the experiments depicted in the video, he cited seven other articles and referred in his report to over 400 original papers he has written on traumatic brain injury.  *See Doc. No. 118, Ex. K, Gennarelli Report.*  In these circumstances, my exclusion of Plaintiffs' video was proper because it had nothing to do with this case.  See Moyer v. United Dominion Indus., 473 F.3d 532, 542 (3d Cir. 2007) ("Of course, only relevant evidence is admissible at trial.") (citing Fed. R. Evid. 402).

Insofar as Plaintiffs sought to challenge the validity of these experiments -- by suggesting to the jury that the baboons' diffuse axonal injuries may have been the result of hammer blows,

not head rotations -- Plaintiffs in fact did so.  Once again, by the time Defendants objected, the jury already knew from Plaintiffs' questions and Dr. Gennarelli's answers that the subject baboons had suffered diffuse axonal injury after their heads were both rotated and struck, and that a video was made of the experiments.  It is obvious, however, that Plaintiffs' real goal here was not to challenge the validity of these almost thirty-year-old experiments.  Rather, Plaintiffs sought to introduce the video in a tawdry attempt to inflame the jury.  Plaintiffs did not wish to show the jury a complete video of all the experiments, but only the "three, four minutes" when the baboons were struck -- a selection plainly intended only to upset the jury.  *7/21/10 Tr. (full) at 224:23-24*.  Accordingly, I conclude in the alternative that the video's probative value (insofar as it had any) was substantially outweighed by its potential to "sway the jury's focus from [the] events [in this case] and invite the jury to react irrationally."  Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 132 (3d Cir. 1997); see also Fed. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . ."); United States v. Anderson, 268 Fed. Appx. 883, 885 (11th Cir. 2008) (evidence is highly prejudicial where it is "likely to inflame – for example, highly excite anger in – the jury").

      **B.**     **Third Restatement and Industry Standards**

          **1.**     **Third Restatement**

      In 2008, the Pennsylvania Supreme Court granted *allocatur* to determine "whether this Court should apply § 2 of the Restatement (Third) of Torts [to products liability claims] in place of 402A of the Restatement (Second) of Torts."  Bugosh v. I.U. N. Am., Inc., 942 A.2d 897, 897 (Pa. 2008) (per curiam).  In April 2009, after painstakingly analyzing the recent evolution of

Pennsylvania products liability law, the Third Circuit predicted that the Supreme Court would indeed adopt the Third Restatement.  See Berrier v. Simplicity Mfg., 563 F.3d 38, 53 (3d Cir. 2009) ("We believe that Justice Saylor's concurring opinion in [Phillips v. Cricket Lighters] foreshadows the Pennsylvania Supreme Court's adoption of §§ 1 and 2 of the Third Restatement's definition of a cause of action for strict products liability.").  After Berrier issued, however, the Bugosh Court dismissed *allocatur* as improvidently granted.  971 A.2d 1228 (Pa. 2009).

Shortly before trial, I ruled that under Berrier, I was required to apply the Third Restatement to Plaintiffs' claims.  *(Doc. No. 139.)*  Plaintiffs now argue that "applying the Third Restatement to this case was a substantial error of law" because: 1) the Bugosh Court "dismissed the appeal without getting to the substantive issues of the case"; and 2) the Third Circuit and Pennsylvania courts continue to apply the Second Restatement to products liability claims despite the holding in Berrier.  *(Doc. No. 162, Mem. at 5-7.)*  I disagree.

First, as I explained in my pre-trial ruling, the Berrier Court based its determination that the Pennsylvania Supreme Court would adopt the Third Restatement not upon the pendency of the Bugosh appeal itself, but rather upon "relevant state precedents, analogous decisions, considered dicta, scholarly works, and . . . other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand."  Berrier, 563 F.3d at 46 (citations and quotation marks omitted); see also id. at 40 ("We predict that *if the Pennsylvania Supreme Court were confronted with this issue*, it would adopt the Restatement (Third) of Torts, §§ 1 and 2 . . .") (emphasis added).  Accordingly, the procedural dismissal of Bugosh does not impugn the determination in Berrier.

7

Moreover, although "there is divergence among [Pennsylvania] *district courts* regarding whether the Restatement (Second) or Restatement (Third) should apply [after Bugosh]," the Third Circuit has yet to reconsider Berrier.  Hoffman v. Paper Converting Mach. Co., 2010 U.S. Dist. LEXIS 19489, at *9 (E.D. Pa. Mar. 3, 2010) (emphasis added).  Plaintiffs' contention that the Third Circuit "applied the Second Restatement to a products liability case after Berrier in Mracek v. Bryn Mawr Hospital" is incorrect.  *(Doc. No. 162, Mem. at 6);* 2010 U.S. App. LEXIS 2015 (3d Cir. 2010).  The Mracek Court simply affirmed a pre-Berrier grant of summary judgment on a "strict malfunction" liability claim.  Id. at *2-3.  Mracek did not even address Berrier because the question of whether the Second or Third Restatement applied was not before the Court.  Accordingly, Mracek has no bearing on the continuing vitality of Berrier.

Plaintiffs' suggestion that the Pennsylvania Supreme Court recently rejected Berrier is also incorrect.  See Barnish v. KWI Bldg. Co., 980 A.2d 535 (Pa. 2009).  In Barnish, the Court held that under the Second Restatement, a plaintiff may "proceed[] under the malfunction theory [of liability], which allows for proof of strict product liability claims through circumstantial evidence."  Id. at 540.  The Court did not, however, address whether § 402A of the Second Restatement continues to define a cause of action for products liability in Pennsylvania. Accordingly, the narrow evidentiary question presented in Barnish in no way impugns Berrier's prediction that the Supreme Court would adopt "the Third Restatement's *definition of a cause of action* for strict products liability."  563 F.3d at 53 (emphasis added).  On the contrary, Justice Saylor -- concurring in Barnish -- expressly "note[d] that the proper approach to the foundational elements of a strict-liability claim is a subject in current controversy in this Court."  Barnish, 980 A.2d at 549 (Saylor, J., concurring) (citing his own dissent in Bugosh).

Finally, although Plaintiffs are correct that some intermediate Pennsylvania courts have continued to apply the Second Restatement, "[t]he Third Circuit's prediction of how Pennsylvania's highest court will rule carries authority independent of intermediate state courts' decisions." Cohen v. American Int'l Ins. Co., 1996 U.S. Dist. LEXIS 2669, at *12-13 (E.D. Pa. Mar. 7, 1996); see also Largoza v. General Electric Co., 538 F. Supp. 1164, 1166 (E.D. Pa. 1982) ("In [the] absence of an authoritative pronouncement from the state's highest tribunal, decisions of the lower state appellate courts should be accorded proper regard, but not conclusive effect.") (citations and quotation marks omitted).  Accordingly, my decision to follow Berrier and to apply the Third Restatement was correct because "[d]istrict courts are bound to follow the predictions and interpretations of state law made by their appellate court." Chester Perfetto Agency, Inc. v. Chubb & Son, 1999 U.S. Dist. LEXIS 16385, at *10 (E.D. Pa. Oct. 21, 1999); see also Hoffman, 2010 U.S. Dist. LEXIS 19489, at *9-10 ("[B]ecause the Pennsylvania Supreme Court decision in Bugosh was merely a procedural dismissal of the matter, the absence of a substantive decision renders the Third Circuit's decision in Berrier binding precedent.  As such, the Restatement (Third) applies."); Richetta v. Stanley Fastening Sys., L.P., 661 F. Supp. 2d 500, 506 (E.D. Pa. 2009) ("The Pennsylvania Supreme Court's recent refusal to address this issue in [Bugosh] does not change the [Berrier] Court's conclusion that the Third Restatement applies to the case at bar."); Martinez v. Skirmish, U.S.A., Inc., 2009 U.S. Dist. LEXIS 43837 (E.D. Pa. May 21, 2009) (applying the Third Restatement in light of Berrier).

### 2.    Industry Standards

Plaintiffs also argue that "it was a substantial error of law to allow Defendants to use [industry standards] in this case." *(Doc. No. 162, Mem. at 8.)*  Again, I disagree.

9

Plaintiffs are correct that the Pennsylvania Supreme Court had previously held under the Second Restatement that industry standards and practices are inadmissible in strict liability cases because they "inject into the case concepts of negligence law" that "are to be kept out of cases based on strict liability under Section 402A . . ." Lewis v. Coffing Hoist Div., Duff-Norton Co., 528 A.2d 590, 591, 594 (Pa. 1987) (citations omitted). As I have explained, however, Plaintiffs' claims are governed by §§ 1 and 2 of the Third Restatement rather than § 402A of the Second. "[B]y embracing concepts of foreseeability [and reasonable alternative design], the Third Restatement acknowledges that conceptions borrowed from negligence theory are embedded in strict products liability doctrine in Pennsylvania." Richetta, 661 F. Supp. 2d at 505 n.6 (citations and quotation marks omitted). That Pennsylvania courts had historically excluded industry standards in products liability cases thus has no bearing on their admissibility here. See Bugosh, 971 A.2d at 1249 (Saylor, J., dissenting) (prior rulings grounded in the Second Restatement – including the holding in Lewis that industry standards are inadmissible  – "should be revisited" under the Third Restatement).

Moreover, the Berrier Court explicitly acknowledged that evidence of industry standards "may be [] relevant [to a] strict liability theory [under the Third Restatement]." Berrier, 563 F.3d 38, 43 n.7. Indeed, the commentary to § 2 of the Third Restatement provides that

> [a] defendant is . . . allowed to introduce evidence with regard to industry practice that bears on whether an alternative design was practicable. Industry practice may also be relevant to whether the omission of an alternative design rendered the product not reasonably safe. While such evidence is admissible, it is not necessarily dispositive. If the plaintiff introduces expert testimony to establish that a reasonable alternative design could practically have been adopted, a trier of fact may conclude that the product was defective notwithstanding that such a design was not adopted by any manufacturer, or even considered for commercial use, at the time of sale.

Restatement (Third) of Torts: Products Liability, § 2, cmt. d.  Accordingly, "[t]he overwhelming

majority of jurisdictions [applying the Third Restatement] hold that compliance with product

safety regulation is relevant and admissible on the question of defectiveness . . . "  Restatement

(Third) of Torts: Products Liability, § 4, cmt. e; see e.g. Swiatlowski v. Werner Co., 2006 U.S.

Dist. LEXIS 10842, at *17 (D. Ill. 2006) ("The plaintiff can also prove strict liability by

presenting proof that the defendant deviated from the industry manufacturing standard.").

      Finally, Plaintiffs' reliance on Czarnecki v. Home Depot USA, Inc. is misplaced.  2009

U.S. Dist. LEXIS 51637 (E.D. Pa. June 15, 2009).  Plaintiffs are correct that in Czarnecki -- a

post-Berrier products liability case -- the Court would not admit industry standards at trial.  Id. at

*21-22   The Court did not, however, hold that industry standards are always inadmissible under

Pennsylvania law.  Rather, the Court refused to admit the particular standards at issue in

Czarnecki only because those standards were irrelevant to the defect alleged in that case.  Id.

Here, by contrast, Defendants sought to introduce the Consumer Product Safety Commission

standards, which establish the minimum impact accelerations that all bicycle helmets sold in the

United States must withstand.  16 C.F.R. § 1203.12.  Insofar as the purpose of these standards is

"to reduce the likelihood of serious injury and death to bicyclists resulting from impacts to the

head," they were directly relevant to Plaintiffs' claim that the helmet worn by Mr. Covell failed

to protect him from injury because it was defectively designed.  16 C.F.R. § 1203.2.

Accordingly, my decision to allow the admission of the CPSC standards at trial was not an error

of law.  See St. Louis Univ. v. United States, 182 F. Supp. 2d 494, 501 (D. Md. 2002) (industry

standards and regulations properly admitted if relevant to defect at issue).

### 3.    Harmless Error

As I have explained, "[i]t is only those errors that have caused substantial harm to the losing party that justify a new trial.  Those errors that are not prejudicial do not call for relief under Rule 59." Haymond v. Lundy, 205 F. Supp. 2d 390, 395 (E.D. Pa. 2002) (citation and quotation marks omitted).  Here, Plaintiffs contend, without any explanation, that they were prejudiced by my application of the Third Restatement and my admission industry standards. *(Doc. No. 162, Mem. at 7-8.)*  The record shows just the opposite: that the application of the Third Restatement and admission of the CPSC standards benefitted Plaintiffs.

Plaintiffs' theory of liability did not change as a result of my decision to apply the Third Restatement.  From the outset of this litigation, Plaintiffs alleged that the helmet worn by Mr. Covell was defectively *designed* because it failed to protect Mr. Covell during an accident which, according to Plaintiffs, occurred at an impact speed of approximately 13 miles per hour.  *See Doc. No. 61, Plaintiffs' Pretrial Mem. at 1-2 ("[T]he impact speed of Covell's head with the windshield was in the range of 15 mph which translates to a perpendicular speed of under 13 mph. . . . [T]he helmet was defective because its design did not extend adequate energy absorbing material far enough to absorb the impact forces in this accident."); see also Doc. No. 67, Ex. D, Robson Report at 7 ("[T]he speed of Covell's helmet at and perpendicular to the windshield was computed to be 13 mph . . ."); 7/19/10 Tr. (full) at 107:9-10 (testimony of Plaintiffs' expert Lance Robson that "[Mr. Covell's] perpendicular speed to the windshield was 13 miles an hour."); Trial Tr. vol. 3 (excerpts), 24:20-23, July 20, 2010 (testimony of Plaintiffs' expert Dr. James Pugh that "the equivalent impact to the accident helmet . . . was no greater than 13.3 miles per hour . . .").*

The CPSC standards introduced at trial require that all bicycle helmets sold in the United States transfer peak accelerations of no more than 300 gravitational units when dropped from a height of two meters onto a flat anvil.  See 16 C.F.R. § 1203.12.  Both Parties agreed that a drop test from this height results in an impact speed (between the helmet and the anvil) of 13.9 mph. *See 7/20/10 Tr. (excerpts) at 38:3-6 (testimony Plaintiffs' expert Dr. James Pugh); 7/22/10 Tr. (full) at 113:5-11 (testimony of defense expert David Thom);* see also *Doc. No. 67, Ex. D, Robson Report at 7.*  Under the Third Restatement, a helmet that fails to meet this CPSC standard is *per se* defective.  See Restatement (Third) of Torts: Products Liability, § 4 ("[A] product's noncompliance with an applicable product safety statute or administrative regulation *renders the product defective* with respect to the risks sought to be reduced by the statute or regulation.") (emphasis added).  Indeed, that is how I charged the jury:

> You may consider evidence relative to standards or customs in the industry in determining whether the Giro Monza Road Helmet was defective.
>
> **If you find that the Giro Monza Road Helmet did not comply with the Consumer Product Safety Commission Standards, that non-compliance renders the product defective with respect to the risks sought to be reduced by the Consumer Product Safety Commission Standards.**
>
> If you find that the Giro Monza Road Helmet complied with the Consumer Product Safety Commission Standards, that compliance is properly considered in determining whether the helmet is defective with respect to the risks sought to be reduced by the Consumer Product Safety Commission Standards, but such compliance does not, as a matter of law, preclude a finding of product defect.

*Trial Tr. vol. 6 (full), 111:10-24, July 23, 2010 (emphasis added).*

Both before and during trial, Plaintiffs argued that the Giro Monza helmet failed to protect Mr. Covell at an impact speed of 13 mph and thus did not meet the 13.9 CPSC standard. In his February 28, 2010 report, for example, Plaintiffs' design defect expert Dr. James Pugh

argued that

> [g]iven that all the testing was done under less severe conditions than the CPSC
> certification testing (6-foot drop as opposed to a 6.56-feet), it is clear that the Giro
> helmet failed the [CPSC] test requirements and that the Bell Faction helmet
> satisfied the [CPSC] requirements, the implication being that significant head
> injury would occur with the Giro helmet and no head injury with the Bell Faction
> helmet.

*(Doc. No. 69, Ex. G, Pugh Report.)*  Dr. Pugh similarly testified at trial that "[t]he blow that was

sustained in the accident to the helmet was within the magnitude of those blows that the CPSC

standard requires to be protected against." *7/20/10 Tr. (excerpt) at 26:11-14.*

Had I applied the Second Restatement to Plaintiffs' claims, the jury could have returned a

verdict for Defendants even if it agreed with Plaintiffs that the helmet, as designed, did not meet

the CPSC standard because it did not adequately protect Mr. Covell at 13 mph.  Under the Third

Restatement, by contrast, the jury would have been *required* to find that the helmet was

defectively designed if it did not meet the 13.9 mph CPSC standard.  Thus although Plaintiffs are

correct that "the Third Restatement involves a different set of legal principles," my decision to

apply these principles was ultimately to Plaintiffs' *benefit*.  *(Doc. No. 162, Mem. at 7.)*

In sum, I did not err in applying the Third Restatement or admitting industry standards.

Even if my rulings were erroneous, however, Plaintiffs would not be entitled to relief because the

rulings benefitted them.  See Fed. R. Civ. P. 61; see also Abrams v. Lightolier Inc., 50 F.3d 1204,

1213 (3d Cir. 1995) ("[U]nder Federal Rule of Civil Procedure 61 errors in the admission or

exclusion of evidence can not be grounds for reversal or a new trial if they constitute harmless

error."); Lincow, 2010 U.S. Dist. LEXIS 54513, at *39-40 ("Trial errors are considered harmless

when it is highly probable that the error did not affect the outcome of the case.") (quotation

marks omitted).

14

IV.     **CONCLUSION**

**AND NOW,** this 8th day of September, 2010, upon consideration of Plaintiffs' Motion for a New Trial *(Doc. No. 162)*, Defendants Response *(Doc. No. 164)*, Plaintiffs' Reply *(Doc. No. 165)*, Defendants' Sur-Reply *(Doc. No. 172)*, and all related documents, it is hereby **ORDERED** that Plaintiffs' Motion is **DENIED.**

**IT IS SO ORDERED.**

*/s/ Paul S. Diamond*

_____

**Paul S. Diamond, J.**